# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 23, 2010

No. 09-30039

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

MARIA CARMEN PALAZZO, M D, Ph D, MMM,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:05-cr-00266-MVL-SS

Before JOLLY and DENNIS, Circuit Judges, and BOYLE, District Judge.[*]

PER CURIAM:[**]

This appeal arises out of a jury conviction for Medicare fraud. Because the evidence was sufficient to support the verdict, the indictment was not duplicitous, and the district court did not err in admitting a demonstrative aid or in calculating the loss and forfeiture amounts, we AFFIRM.

---

[*] District Judge, Northern District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-30039

## BACKGROUND

Maria Carmen Palazzo ("Palazzo") is a psychiatrist who, until 2005, operated a private psychiatric practice in New Orleans, working out of both an office on the seventh floor of the Gumbel Building and her home. From the Summer of 2000 until March 2005 Palazzo was also the medical director of the Touro Infirmary Partial Hospitalization Program ("PHP"), which was located on the eighth floor of the Gumbel Building. Evidence of the following facts was adduced at trial through the testimony of numerous employees of PHP, among other witnesses. PHP was a psychiatric unit that was designed to function as a bridge between inpatient and outpatient facilities. PHP employed social workers, therapists, and nurses, all of whom were paid by Touro. PHP operated Monday through Friday, from about 8:30 a.m. to 2:30 p.m. The patients were either eating breakfast or lunch, in group therapy, or taking smoke breaks at all times during that period. Many of the patients were transported to and from PHP by bus. In addition to her private practice and her role at PHP, Palazzo, during the time period in question, conducted utilization review for Mississippi Medicaid claims, reported spending more than 50 percent of her time on her real estate business, served as an expert witness for a forensic referral service, contracted with other mental health centers to provide on-site care at those facilities, acquired a master's degree in medical management, and conducted clinical drug trials.

On June 14, 2007, Palazzo was charged under a superseding indictment with 40 counts of violating 18 U.S.C. § 1347.[1] These charges can be grouped into three general means of executing the overall scheme of defrauding Medicare; we consider the evidence underlying these convictions according to this division.

---

[1] Palazzo was also charged with 15 counts of violating 21 U.S.C. §§ 331(e) and 333(a)(2). These counts concern drug studies conducted by Palazzo and are not at issue in this appeal.

No. 09-30039

In Counts 1-14, Palazzo was charged with billing Medicare for services that did not qualify for the codes with which she billed them. These counts cover instances in which Palazzo billed Medicare using a code for professional services classified as Evaluation and Management ("E&M") services, which require face-to-face visits between a physician and a patient and require at the least that the patient be present when the services are performed. The Government produced evidence that Palazzo had her assistant bill Medicare every morning before any services were rendered. The census for the day was faxed to Palazzo's office on the seventh floor every day and billing was prepared by 8:30 or 9:00 a.m. Palazzo herself visited PHP only about three times a week, staying only 10-20 minutes. When Palazzo did come she did not arrive at PHP until at or near the end of the patients' day. During the time Palazzo was at PHP the patients were in group therapy or were leaving on the bus. Palazzo did not have a private room where an E&M visit could have been conducted, and only saw the patients while they were in group therapy with another therapist or when she boarded their bus briefly as it was leaving. Various witnesses testified that they never saw Palazzo conduct a single individual session with a single patient at PHP.

Counts 1-14 specifically cover occasions on which Palazzo billed Medicare for "E&M subsequent visit" codes 99232 and 99233. These types of visits require at least two of three components: a detailed history, a detailed examination, and medical decision-making of high complexity. The suggested Medicare guideline time factors for 99232 and 99233 visits are 25 and 35 minutes per patient, respectively. Consistent testimony from the witnesses established that none of the billings covered by Counts 1-14 were performed in the presence of patients, much less in direct interaction with them. Instead the billings were submitted for what Palazzo called "treatment teams," which were meetings held *after* the patients left PHP at which the nurse, social workers, and PHP staff discussed patient progress and Palazzo typed notes on her computer which were later

3

placed in patient charts.  A Medicare expert presented by the Government testified at trial that such meetings could not be given an E&M code because there were no face-to-face meetings with patients as the codes require.

In Counts 15 and 17-27[2], Palazzo was charged with billing for services performed by her physician's assistant ("PA"), Natalie Prejean ("Prejean"), as if she had performed them herself. Prejean was licensed under state law to practice medicine under the supervision of a practicing physician, and Palazzo obtained a Medicare PIN for Prejean so that she could bill Medicare for Prejean's services.  However Palazzo billed Medicare under her own PIN for services that, the evidence showed, Prejean provided at PHP while Palazzo was not present. Medicare establishes different billing options for PA services depending on whether the facility in which the services are performed is an inpatient facility or a doctor's office. PHP occupies a grey area between these two categories, but the evidence produced at trial proved that Palazzo did not bill Prejean's services properly whether PHP is considered an inpatient or outpatient facility.

Assuming PHP to be an *inpatient* facility, Palazzo could have legally obtained reimbursement for Prejean's PA services to patients in two ways: (1) through Prejean's PIN, which provided reimbursement directly to Palazzo at 85 percent of the scheduled fee amount, or (2) as a service "incident" to Palazzo's services, in which case Medicare would reimburse *the hospital* at 100 percent of the scheduled fee amount. Instead of using either of these proper avenues, however, Palazzo billed Medicare for Prejean's services using Palazzo's own Medicare PIN, thereby receiving 100 percent of the scheduled fee *directly* for services that Prejean had performed. During one week that Palazzo was overseas Prejean's services were billed under her own Medicare PIN (producing a reimbursement of 85 percent of the scheduled fee amount), but this was the

---

[2] Count 16 was dismissed before trial.

only time that any services were billed under Prejean's PIN. If, on the other hand, PHP was considered an *outpatient* facility/doctor's office, Palazzo could have billed Prejean's services as "incident to" Palazzo's services using Palazzo's own Medicare PIN and received 100 percent of the scheduled fee, but only if she had direct personal supervision over Prejean while the services were provided. This form of supervision requires that the supervising physician be physically present in the office suite and immediately available to direct or assist the PA. It would *not* have been sufficient for Palazzo to be in her seventh floor office suite while Prejean was in the PHP on the eighth floor, much less not present in the building at all (as the Government's evidence showed was usually the case).

Further, the Government's Medicare expert testified at trial that not only did Palazzo incorrectly bill these services under either theory, but that the services were in fact not billable *at all* as E&M services. The activities performed by Prejean for which Palazzo was billing Medicare under Palazzo's PIN took place in the 15-60 minutes Prejean spent at PHP on an average day, during which she saw patients, sat in group therapy, talked to staff, and wrote progress notes. Prejean testified that her activities at PHP were not consistent with her understanding of the kind of services that qualify as E&M services and that she did not have sufficient time to have more than minimal contact with the patients.[3] According to the Government's Medicare expert these services were not billable because they were not medically necessary, were not E&M-coded services, and were not supervised under the "incident to" framework available for services provided by a PA in a doctor's office when the doctor is physically present to supervise or help. In fact patients receiving group therapy

---

[3] At some point Prejean learned that Palazzo was signing and taking credit for the notes she wrote while at PHP; she subsequently began signing the notes herself.

categorically cannot receive an Evaluation and Management service at the same time.

Counts 28-40 concern the period from July 17, 2000 until October 31, 2004, during which Palazzo was a consultant and/or medical director for Touro's in-patient psychiatric unit and PHP and contracted to provide administrative services to or on behalf of Touro. Palazzo was paid $150 an hour for these services and made the maximum allowable salary of $144,000 a year. Palazzo's contract specified that any reimbursement Touro received for the contract would come through Medicare, and that any change in the method of Medicare reimbursement relative to the contract would amend the contract. One of the contract documents also made clear that if Palazzo was performing services for Touro during a given time period she could not bill anyone else for the same period of time. Touro reimbursed Palazzo based on monthly invoices she submitted for time she spent doing administrative work for the hospital pursuant to her contract. Touro listed the payments it made to Palazzo for this work on annual cost reports submitted to Medicare as operational costs and received partial reimbursement for them.

The invoices that Palazzo submitted to Touro included weekly entries for PHP staffing for between one and five hours. The Government's evidence included testimony that the only PHP meetings Palazzo held on days for which she submitted invoices to Touro were treatment team meetings to discuss patient progress, which she billed to Medicare directly, and which therefore could not be billed to Touro under her contract. The Government also presented several witnesses who testified that Palazzo billed Touro for meetings with them that had never happened, and evidence that showed that Palazzo billed Touro, on one occasion, for six hours of activity on a day when Palazzo was sitting for two exams to complete her master's degree, and on another occasion, billed

No. 09-30039

Touro for 14.5 hours of travel to Indianapolis for a meeting when in fact she was in Austin attending a deposition for a legal case with no connection to Touro.

A jury convicted Palazzo of Counts 1-15 and 17-40 on April 16, 2008, and returned a forfeiture verdict of $655,260.97. Palazzo filed a motion for judgment of acquittal or, in the alternative, for a new trial, contending that the Government had failed to prove she executed the health care fraud and failed to prove criminal intent, that a demonstrative aid was erroneously admitted, and that the district court had improperly performed the loss and forfeiture calculations. The district court denied the motion and rendered judgment in favor of the Government in the amount of the jury's forfeiture verdict. Palazzo was sentenced to 87 months in prison followed by a three-year term of supervised release. Palazzo timely appealed.

## ANALYSIS

Palazzo brings several claims on appeal: (1) that the evidence was insufficient to support her conviction, (2) that the indictment was duplicitous, (3) that the district court erred in admitting a demonstrative aid into evidence, and (4) that the district court erred in calculating the loss and forfeiture amounts. We address each in turn.

*Sufficiency of the Evidence*

Palazzo argues first that the evidence was insufficient to support her conviction. This court reviews a preserved sufficiency of the evidence claim *de novo. United States v. Alarcon*, 261 F.3d 416, 421 (5th Cir. 2001). The inquiry is whether, "viewing all evidence in the light most favorable to the verdict," a rational jury "could have found that the evidence established the elements of the offense beyond a reasonable doubt." *United States v. Villarreal*, 324 F.3d 319, 322 (5th Cir. 2003). All reasonable inferences must be drawn in favor of the verdict. *Id.*

No. 09-30039

Palazzo argues that the evidence was insufficient as to Counts 1-14 because the Government did not put on evidence as to Palazzo's failure to meet with the specific patients on the specific dates mentioned in those counts. The Government presented testimony from multiple witnesses, however, that Palazzo never met with a patient individually. The testimony indicated that Palazzo was rarely at PHP when the patients were, and if she was, she only saw them "en masse" in the hallway or on the bus. If Palazzo never met with any patients individually, a clear inference can be drawn that she did not meet with the specific patients charged in the indictment individually, as is required for an E&M service. *See United States v. Martinez*, 588 F.3d 301, 315 (6th Cir. 2009) ("lack of individualized patient testimony for each count in the indictment alone does not render the evidence before the court insufficient" where jury had heard testimony that the doctor could not have conducted the number of procedures and consultations for which he billed Medicare). Further the consistent testimony was that there were no patients at the "treatment team" meetings for which Palazzo billed Medicare and which are the source of Charges 1-14, and the Government's Medicare expert testified that such meetings do not qualify as Evaluation and Management activities and could not be billed as such. The Government also presented evidence that Palazzo was employed to do high-level administrative work by Touro Hospital and had a master's degree in medical management, from which a jury could rationally infer that she knew she was billing fraudulently for services that either were not performed or did not qualify for Medicare reimbursement under the codes she was using. The evidence was therefore sufficient as to these counts.

Palazzo next argues that the evidence was insufficient as to Counts 15 and 17-27 because the Government failed to prove criminal intent because, she claims, the rules for billing a PA's services are ambiguous and confusing and she submitted the bills in good faith. While a jury reasonably might have so found

8

or inferred, because the jury convicted her the proper inquiry is instead whether it reasonably could have found or inferred the facts necessary to her conviction beyond a reasonable doubt.  The jury reasonably could have so found. The evidence presented at trial established that whether PHP was an inpatient *or* an outpatient facility, Palazzo improperly billed the services in question; that the services in question were not reimbursable services under Medicare; that Palazzo had applied for and received a separate PIN code for Prejean's services but used it only during a week that Palazzo was overseas; and that Palazzo was hired by Touro to provide director-level administrative services and had a master's degree in medical management. A reasonable jury could infer from this evidence that Palazzo was aware of the correct billing procedures and chose to bill improperly to obtain the maximum amount possible directly, and that the Government established an evidentiary basis from which a jury could find and infer these facts beyond a reasonable doubt

Palazzo also argues that the fact that the district court's failure to find that Palazzo had perjured herself, when she testified that she was confused about the proper billing procedures, precluded the jury's finding that she acted with criminal intent. The jury was not so legally constrained, however, because "not every accused who testifies at trial and is convicted will incur an enhanced sentence under U.S.S.G. § 3C1.1 for committing perjury." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). Perjury involves a finding of *intent to testify falsely*, not simply a finding that testimony was inaccurate or false. *United States v. Collier*, 527 F.3d 695, 702 (8th Cir. 2008). In other words, the district court must find that the defendant provided "false testimony concerning a matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Collier*, 527 F.3d at 702.[4]

---

[4] Even if the jury *had* been required to find that Palazzo not only knew the billings were improper when she made them but lied on the stand, the fact that the district court did not

No. 09-30039

Palazzo's final argument as to Counts 28-40, which concern thirteen fraudulent monthly invoices Palazzo submitted to Touro for her services as the hospital's psychiatric medical director, is that the evidence was insufficient because she intended to defraud only Touro and not Medicare. Palazzo's reliance on several older mail fraud cases, however, is misplaced. *Kann v. United States*, 323 U.S. 88 (1944) and *Parr v. United States*, 363 U.S. 370, 393 (1960), upon which Palazzo relies, concerned mail fraud in which defendants who had written fraudulent checks or made unauthorized purchases were not guilty of mail fraud when those checks were subsequently sent to another bank or the purchase receipts were submitted to another company, respectively. Palazzo's contracts with Touro, however, made clear that Touro's source of reimbursement for any funds paid to Palazzo was Medicare, and that any change in Medicare reimbursement policy would cause the contracts to be amended in turn. More analogous than the cases cited by Palazzo is *United States v. Hanson*, 161 F.3d 896, 901 (5th Cir. 1998), in which this court held that a defendant's claim that he did not commit bank fraud because his misrepresentations were made to a mortgage company that was a subsidiary of a bank, not the bank itself, and thus he lacked the intent to defraud the bank, "border[ed] on frivolousness." Indeed, the Second Circuit has rejected Palazzo's argument in an analogous case concerning fraudulent claims to the New York State Department of Health. *United States v. Huber*, 603 F.2d 387, 400 (2d Cir. 1979) ("[R]egardless of whether all of the invoices had already been paid [by the hospital to the doctor before the hospital submitted them to the government for reimbursement], the mailing to obtain reimbursement was a part of this ongoing scheme to defraud.

---

agree would not make the evidence insufficient. As the Eighth Circuit has explained, "a district court might conclude that the evidence was sufficient to permit a jury to find guilt beyond a reasonable doubt, yet not itself be convinced of the defendant's guilt, even by a preponderance." *United States v. Smith*, 62 F.3d 641, 648 n.3 (1993).

10

. . . [T]he jury could find that government funding of hospital expansion was essential to the prosperity of appellant's fraudulent scheme.").

Further, when a statutory scheme does not specify that misrepresentations be made directly to the victims this Court has not read such a requirement into the elements of the crime. *See United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995). The statute under which Palazzo was convicted does not specify that misrepresentations must be made directly to Medicare but only that "Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. § 1347. The jury was presented with sufficient evidence to infer that Palazzo submitted invoices to Touro knowing that Touro paid her on the basis of its ability to obtain reimbursement from Medicare, and that Palazzo was therefore obtaining money from Medicare, via Touro, for services she had not performed on the basis of fraudulent invoices she knew would be submitted to Medicare. Given Palazzo's high-level administrative job, her master's degree in medical management, and the general sophistication of her scheme, the jury could easily infer that Palazzo submitted these invoices knowing that Touro would submit them to Medicare for reimbursement. The evidence was therefore sufficient to support the verdict on these counts.

*Duplicitous Indictment*

A claim that an indictment is duplicitous is reviewed *de novo. United States v. Mauskar*, 557 F.3d 219, 225 (5th Cir. 2009). A charge is duplicitous if it joins two or more distinct and separate offenses (for instance, two or more

No. 09-30039

distinct and separate executions of a fraudulent scheme) in a single count. *United States v. Lyons*, 703 F.2d 815, 821 n.8 (5th Cir. 1983). An indictment that alleges multiple means to accomplish a single execution of a scheme is *not* duplicitous. *Mauskar*, 557 F.3d at 225. "In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than just one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count." *Id.* (internal quotation marks and citation omitted).

The indictment in this case alleged that on Mondays between August 2001 and October 2004 Palazzo falsely billed Touro for "PHP staffing" and for "inpatient staffing," neither of which were reimbursable under her contract with Touro or under Touro's contract with Medicare. Each of the charges from 28 to 40 consisted of a single invoice submitted to Touro with multiple fraudulent line items for "PHP staffing" and "inpatient staffing." Palazzo argues the indictment is duplicitous because, essentially, each line item on her invoices is a separate fraudulent execution of her overarching scheme, and therefore should not have been listed together in the same count.

But Palazzo is incorrect. As noted, "our task [in this inquiry] . . . [is] to assess whether the indictment itself can be read to charge only one violation in each count." *Mauskar*, 557 F.3d at 225. In this case, each *invoice* (and thus, each of charges 28-40) constituted a separate execution of her scheme (which was to defraud Medicare); the line items on a given invoice were merely *means* by which Palazzo executed that scheme. "That an indictment alleges more than one means by which [a defendant] sought to accomplish [an execution of a] scheme does not render it duplicitous.'" *Mauskar*, 557 F.3d at 225 (internal quotation marks omitted). *See also Owens v. United States*, 221 F.2d 351, 354 (5th Cir. 1955) (holding that "the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme").

No. 09-30039

In *United States v. Adler*, 623 F.2d 1287 (8th Cir. 1980), the Eighth Circuit considered an almost identical situation. In *Adler*, the defendant, like Palazzo, was charged with Medicare fraud for submitting false invoices to Medicare for reimbursement. Each count of the indictment concerned a different invoice, and each invoice had multiple fraudulent line items on it. The defendant challenged the indictment as duplicitous because some of the counts involved invoices with more than one fraudulent line item on them. The Eighth Circuit rejected this line of reasoning, explaining that "the government charged only one crime in each count of the indictment" and that "there may be more than one piece of evidence to support each count, but that certainly does not make the counts duplicitous." *Id.* at 1290. In other words, each invoice was a single execution, and the line items on each invoice were merely additional means of pursuing the single execution. This case is essentially identical. The scheme was to defraud Medicare by submitting falsified invoices to Touro, which would then submit them to Medicare. Each invoice was a single execution, and the various falsified entries that Palazzo listed on each invoice were multiple *means* of accomplishing a single execution (invoice) in the overall scheme (defrauding Medicare). The indictment was therefore not duplicitous and Palazzo is not entitled to relief on this ground.

*Demonstrative Aid*

Evidentiary admissions by the district court are reviewed for abuse of discretion. *United States v. Ollison*, 555 F.3d 152, 161 (5th Cir. 2009). "An error in the admission of evidence is excused unless it had a substantial and injurious effect or influence in determining the jury's verdict." *United States v. Harms*, 442 F.3d 367, 375 (5th Cir. 2006).

During Palazzo's trial, after all of the testimony detailed above, the district court admitted a chart prepared by a Government expert that showed the number of hours per day that Palazzo claimed to have spent providing services

13

she had billed to Medicare. In calculating these numbers, the Government used the guidelines suggested by Medicare for the appropriate length of time for a doctor to spend on the kinds of treatment and activities Palazzo billed. Palazzo argues that admitting this chart was an abuse of discretion and had a substantial and injurious effect on the jury's guilty verdict, primarily because the chart was based on "time billing" and Palazzo claims to have billed based on "key components" of services, not on time spent. Palazzo's contention is meritless however; the chart was properly admitted, the jury was properly instructed, and the evidence against Palazzo was so otherwise overwhelming that no prejudice could have resulted.

"[A]llowing the use of charts as pedagogical devices intended to present the government's version of the case is within the bounds of the trial court's discretion to control the presentation of evidence under Rule 611(a)." *United States v. Taylor,* 210 F.3d 311, 315 (5th Cir.2000) (internal citation and quotation marks omitted).[5] "Summary charts are, in the trial court's discretion, ordinarily admissible when: (1) the charts are based on competent evidence before the jury; (2) the primary evidence used to construct the charts is available to the other side for comparison in order that the correctness of the summary

---

[5] Although the Government argues that the chart was admissible either as a demonstrative aid under Federal Rule of Evidence 611(a) or as a summary of voluminous evidence under Federal Rule of Evidence 1006, it is clear that the district court admitted the chart as the former and not the latter. Charts summarizing voluminous material under Federal Rule of Evidence 1006 are admitted as evidence themselves when the evidence underlying them is too voluminous to be effectively presented, while pedagogical or demonstrative aids submitted under Federal Rule of Evidence 611(a) are not introduced into evidence, but merely shown to the jury to help them understand evidence that has already been admitted into the record. *United States v. Buck*, 324 F.3d 786, 790-91 (5th Cir. 2003). In this case, the district court's instructions to the jury made clear that the chart was *not* evidence, but merely summarized evidence that had already been admitted. As such, the chart was not a summary of voluminous evidence submitted to stand in for the evidence itself, but was instead merely a summary of evidence *already admitted*, and was therefore a demonstrative aid under Rule 611(a). *See Weinstein's Federal Evidence* § 1006.08[4]; *United States v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003).

may be tested; (3) the person who prepared the charts is available for cross-examination; and (4) the jury is properly instructed concerning their consideration of the charts." *United States v. Winn*, 948 F.2d 145, 159 (5th Cir. 1991). Full cross-examination and proper instructions to the jury minimize the chance of prejudice. *Id.* at 159 n. 36.

In this case, the jury had been presented with evidence concerning the fraudulent bills Palazzo submitted to Medicare for services never performed and for services not eligible for reimbursement, and testimony from her staff about the minimal time she spent at PHP and her complete lack of individual interaction with patients, as well as testimony and documents concerning the amount of time Palazzo had spent or claimed to spend on other activities (her other jobs, her real estate business, etc.) during the period the bills were generated. The witness who prepared the chart appeared in court and was examined and cross-examined by counsel. The district court instructed the jury that: "[c]ertain charts and summaries have been shown to you solely to help explain the facts disclosed by the books, records and other documents which are in evidence in the case. These charts and summaries are not proof of any facts. You should determine the facts from the evidence." The demonstrative aid met all of the requirements for presentation, and the district court did not abuse its discretion in allowing it to be shown to the jury.

Further, there was no prejudice to Palazzo. The evidence in the case against Palazzo was overwhelming, even in the absence of any argument about how many hours it was possible to bill in a day. The simple fact is that all of the evidence presented at trial showed that Palazzo *never* provided *any* of the services that she billed, and that those services provided by Prejean that were billed under Palazzo's PIN were not eligible for reimbursement. Palazzo, as an administrative director of a major hospital who possessed a master's degree in medical management, was not able to convince the jury that any of this was good

faith error. Given this evidence, the question of whether Palazzo billed more hours than were possible in a day was minor, or even irrelevant, because *none of the bills charged in the indictment were properly submitted for eligible services actually performed.* In other words, the evidence, without the chart, showed that Palazzo had never performed any of the services in question and that none of the services submitted were eligible for reimbursement, and therefore the implication created by the demonstrative aid, if any, that she could not have performed all of the fictitious services in the time she claimed was not prejudicial. *See Winn*, 948 F.2d at 157-58 (holding that any error in admission of demonstrative aid was harmless because evidence of defendant's guilt was overwhelming).

*Loss & Forfeiture Calculations*

Factual determinations regarding loss amount for Guideline calculation purposes are reviewed for clear error. *Ollison*, 555 F.3d at 164. With regard to forfeiture, the district court's factual findings are reviewed for clear error, but whether those facts are sufficient to constitute a proper criminal forfeiture is reviewed *de novo. United States v. Marmolejo*, 89 F.3d 1185, 1197 (5th Cir. 1996).

The jury's forfeiture verdict was $655,260.97, which the district court found to be the loss amount as well. This number included Palazzo's Medicare proceeds from PHP between 2000 and 2005 ($467,666.97); her proceeds from cross-billing the E&M services she billed to Medicare to Medicaid as well ($95,000.00); and Medicare's full reimbursement to Touro for Palazzo's medical director duties ($92,594.00). Palazzo argues that the court's determination was clearly erroneous for several reasons.

First, Palazzo argues that even if she improperly billed Medicare for activities performed by Prejean, her PA, in Counts 15 and 17-27, the proper billing for such activities would have been at 85 percent reimbursement, not 100

percent, and so Medicare lost only the 15 percent difference. The Government's evidence established, however, that the services Prejean performed were not themselves reimbursable services, because they were coded as E&M services, which require an individual meeting with a patient, and Prejean testified that she did not have such meetings and that the services she was performing were not what she considered an E&M service. Palazzo is correct that the Government did not allege that "no services were provided," but the Government did allege, and prove, that no *reimbursable* services were provided. The district court did not clearly err in determining that there was therefore no residual amount that should be credited to Palazzo.

Palazzo also contends that the entire amount Palazzo billed to Medicare includes thousands of bills submitted over five years and that the Government did not prove that all of these bills were fraudulent. What Palazzo neglects to specify is that the amount in question is the amount that was billed for *E&M-coded services*. The Government's evidence showed that none of the staff working at PHP ever saw Palazzo or Prejean provide a service to patients that qualified as an E&M service. Therefore the district court did not clearly err in finding that the amount of money Palazzo received for E&M services – $467,666.97 – was subject to forfeiture.

Palazzo's next contention is that the Medicaid loss of $95,000 was erroneous because that is the amount of Palazzo's entire Medicaid reimbursement, including PHP, inpatient, and outpatient billings from 2000 to 2005. The Government, however, showed that the billings to Medicaid were cross-payments made for services billed to Medicare arising out of Palazzo's PHP billings. In other words, the $95,000 in question was billed to Medicaid as a secondary insurer (which would pay for certain amounts of the claim that were not covered by Medicare) for the same PHP services that the Government

showed were never performed. The district court therefore did not clearly err in calculating this part of the loss amount.

Finally Palazzo contends that it was error to include the entire $92,594 that Medicare paid Touro as reimbursement for Palazzo's medical director services because the Government did not prove that every entry on her medical director invoices was fraudulent. Palazzo does not provide any authority for the proposition that she is entitled to a credit for unenumerated services she may or may not actually have provided to Touro. Further, Palazzo does not provide any calculations as to what portion of the amount should not have been counted, identify any particular services that were legitimately performed and billed, or cite to any authority for her argument. She has therefore failed to show any error on the district court's part.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.